Robert V. Prongay (SBN 270796)
   *rprongay@glancylaw.com*
Pavithra Rajesh (SBN 323055)
   *prajesh@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MERCER, Derivatively on Behalf of Nominal Defendant MARAVAI LIFESCIENCES HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM E. MARTIN, III, KEVIN HERDE, R. ANDREW ECKERT, SEAN CUNNINGHAM, BENJAMIN DAVERMAN, JOHN DEFORD, SUSANNAH GRAY, JESSICA HOPFIELD, GREGORY T. LUCIER, LUKE MARKER, CONSTANTINE MIHAS, and MURALI K. PRAHALAD, <br><br> Defendants, <br><br> and <br><br> MARAVAI LIFESCIENCES HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. **'25 CV 1582 H    MSB** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff John Mercer ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Maravai LifeSciences Holdings, Inc. ("Maravai" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Maravai with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

# I.    NATURE AND SUMMARY OF THE ACTION

1.    Maravai is a life sciences company which provides products to enable the development of drug therapies, diagnostics, novel vaccines, and support research on human diseases worldwide.

2.    During 2024, the Individual Defendants (defined herein) issued materially misleading statements about Maravai's financial results and the effectiveness of its internal controls over financial reporting.

3.    On February 25, 2025, before the market opened, Maravai announced it was postponing its fiscal 2024 earnings release and would delay filing its annual report on Form 10-K for the fiscal year ended December 31, 2024. The Company had identified an error in revenue recognition that "resulted in approximately $3.9 million in revenue being recorded in the final week of the second quarter of 2024 upon shipment when it should have been recorded in the first week of the third quarter of 2024 upon receipt by the customer." The Company had identified "a material weakness in its internal controls over revenue recognition." Maravai also required

additional time to "complete its assessment of a potential non-cash impairment charge related to goodwill associated with its previous acquisition of Alphazyme LLC."

4.    On this news, the Company's share price fell $0.87, or 21.70%, to close at $3.14 per share on February 25, 2025, on unusually heavy trading volume.

5.    The foregoing revelations precipitated the filing of a securities class action in this district against Maravai and certain of the Defendants named herein, captioned *Nelson v. Maravai LifeSciences Holdings, Inc., et al.*, Case No. 3:25-cv-00499 (the "Securities Class Action").

6.    Plaintiff did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

9.    Plaintiff owned his Maravai stock during the wrongdoing alleged herein and continues to do so.

**Nominal Defendant**

10.    Nominal Defendant Maravai is a Delaware corporation. Its principal executive offices are located in San Diego, California. Its Class A common stock trades on the Nasdaq exchange under the symbol "MRVI."

**Defendants**

11.    Defendant William E. Martin, III ("Martin") served as Chief Executive Officer ("CEO") of Maravai from July 2023 to June 2025 and as a director of the Company from July 2024 to June 2025. He is named as a defendant in the Securities Class Action.

12.    Defendant Kevin Herde ("Herde") has served as Chief Financial Officer of Maravai since 2017.

13.    Defendant R. Andrew Eckert ("Eckert") has served as Chairman of the Board since December 2024. Eckert received $750,002 in compensation as a director during 2024.

14.    Defendant Sean Cunningham ("Cunningham") has served as a director of Maravai since 2020. Cunningham received $290,053 in compensation as a director during 2024.

15.    Defendant Benjamin Daverman ("Daverman") has served as a director of Maravai since 2020. Daverman received $282,553 in compensation as a director during 2024.

16.    Defendant John DeFord ("DeFord") has served as a director of Maravai since July 2023 and he has been a member of the Audit Committee since September 2023. DeFord received $310,053 in compensation as a director during 2024.

17.    Defendant Susannah Gray ("Gray") has served as a director of Maravai and as Chair of the Audit Committee since 2020. Gray received $317,553 in compensation as a director during 2024.

18.    Defendant Jessica Hopfield ("Hopfield") has served as a director of Maravai and a member of the Audit Committee since 2020. Hopefield received received $310,053 in compensation as a director during 2024.

19.    Defendant Gregory T. Lucier ("Lucier") has served as a director of Maravai since 2020.  Lucier received $282,553 in compensation as a director during 2024.

20.    Defendant Luke Marker ("Marker") has served as a director of Maravai since 2020.  Marker received $282,553 in compensation as a director during 2024.

21.    Defendant Constantine Mihas ("Mihas") has served as a director of the Maravai since 2020.  Mihas received $292,553 in compensation as a director during 2024.

22.    Defendant Murali K. Prahalad ("Prahalad") has served as a director of Maravai since 2020.  Prahalad received $290,053 in compensation as a director during 2024.

23.    Defendants Martin, Herde, Eckert, Cunningham, Daverman, DeFord, Gray, Hopfield, Lucier, Marker, Mihas, and Prahalad are sometimes referred to hereinafter as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

24.    By reason of their positions as officers, directors, and/or fiduciaries of Maravai and because of their ability to control the business and corporate affairs of Maravai, at all relevant times, the Individual Defendants owed Maravai and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Maravai in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Maravai and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Maravai and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Maravai, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Maravai, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

26.    To discharge their duties, the officers and directors of Maravai were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Maravai were required to, among other things:

> (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

> (b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

> (c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

> (d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

# V.    SUBSTANTIVE ALLEGATIONS

## A.    Background

27.    Maravai is a life sciences company which provides products to enable the development of drug therapies, diagnostics, novel vaccines, and support research on human diseases worldwide.

28.    On February 22, 2023, the Company announced the acquisition of Alphazyme, LLC, a privately-held, founder-led OEM provider of custom, scalable molecular biology enzymes, servicing customers in the genetic analysis and nucleic acid synthesis markets.  The total consideration to acquire Alphazyme consisted of a base cash purchase price of $75.3 million, subject to customary post-closing adjustments, and potential performance payments payable in cash of up to $75 million.

29.    Maravai is controlled by a consortium of investment entities affiliated with GTCR, LLC ("GTCR").  GTCR, at relevant times, controlled between 50% and 56% of the voting power of Company stock. Cunningham is Managing Director and Head of the Healthcare Group of GTCR.  Daverman was a Managing Director and Co-Head of the Healthcare Group at GTCR until 2022.  Marker is a Managing Director at GTCR.  Mihas is co-CEO and Managing Director at GTCR.

## B.    The Individual Defendants Cause the Company to Issue Materially Misleading Statements

30.    On February 29, 2024, the Individual Defendants caused the Company to issue its Form 10-K for the 2023 fiscal year, which was signed by Defendants Martin, Herde, Cunningham, Daverman, DeFord, Gray, Hopfield, Lucier, Marker, Mihas, and Prahalad.  Among other things, the Form 10-K stated, "[w]e believe that Alphazyme is uniquely positioned in the market to address customers' custom enzyme needs and has a reputation of being a flexible partner."

31.    The Form 10-K stated the following about the Company's acquisition strategy and its internal controls in connection with acquisitions:

We built our business by acquiring established and emerging companies with strong scientific foundations in our target markets and investing in their systems, processes and people to accelerate their growth and expand their technologies… Our acquisition strategy is to invest significantly in our acquired businesses. We strive to rapidly integrate their quality, human resources, information and financial systems into our shared services. All of our companies share a common enterprise resource planning system, and **we implement our financial controls and reporting systems soon after acquisition**.

32.     Regarding the Company's revenue recognition policies, the Form 10-K stated:

Revenue is recognized when control of promised goods or services is transferred to a customer or distributor in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. Distributors are the principal in all sales transactions with its customers. To determine revenue recognition for its arrangements with customers, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation.

33.     In the portion of the Form 10-K containing the "Report of Independent Registered Public Accounting Firm," the Form 10-K disclosed the existence of a "Critical Audit Matter" related to the Company's goodwill impairment assessment and to the Company's revenue recognition:

**Goodwill Impairment Assessment**

*Description of the Matter*

At December 31, 2023, the Company has recorded goodwill of $326.0 million. As discussed in Note 1 to the consolidated financial statements, goodwill is tested at the reporting unit level for impairment at least annually or more frequently if indicators of potential impairment exist. Under the goodwill impairment assessment, if the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recognized in an amount equal to the amount of the excess carrying amount of the reporting unit over its fair value. During the current year the Company executed a quantitative assessment over the goodwill balance assigned to each reporting unit.

***Auditing the Company's recoverability test for goodwill impairment assessment was challenging due to subjective estimates and assumptions used by the Company to determine fair value of the reporting units. The estimates were subject to higher uncertainty due to management judgements over significant assumptions, including revenue growth rates and valuation related discount rates.***

---

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design, and tested the operating effectiveness of controls over the Company's goodwill impairment process, including controls over management's review of its projected financial information utilized in the valuation of its reporting units.

Our audit procedures over the Company's goodwill impairment assessment included, among others, assessing the reasonableness of significant assumptions, specifically revenue growth rates, discount rates and assessing the completeness and accuracy of the underlying data used by the Company in its analyses. We evaluated whether significant assumptions were reasonable by comparing them to industry data and current market forecasts, and whether such assumptions were consistent with evidence obtained in other areas of the audit. We performed various sensitivity analyses around the assumptions to understand the impact on the fair value calculation. We also involved our valuation specialists to assist us in evaluating the reasonableness of the Company's valuation methodologies and certain significant assumptions used by the Company.

\*\*\*

*Description of the Matter*

During the year ended December 31, 2023, the Company's revenues were $288.9 million, of which a portion relates to products sold to distributors. Its distributor customers resell the products to end users. Revenues from product sales are recognized when control is transferred to the Company's customer.

***Auditing the Company's product sales to distributors was challenging, specifically related to the effort required to audit the respective sales activity to assess whether incentives were provided that were not properly recognized***. This involved judgmentally assessing factors including distributor customer ordering patterns, contractual terms, incentives offered and after shipment credits or free goods as described in Note 1 to the consolidated financial statements.

*How We Addressed the Matter*

We obtained an understanding, evaluated the design and tested the operating effectiveness of internal controls over the Company's process to monitor appropriate terms and conditions for these transactions. This includes testing relevant controls over the information systems that are important to the initiation, recording and billing of revenue transactions as well as controls over the completeness and accuracy of the data used.

Our audit procedures over the Company's product sales to distributor customers included, among others, performing analytical procedures to detect and investigate anomalies within the data. We also examined the terms and conditions of selected new or amended contracts with distributor customers and its impact on the Company's recognition model. We also confirmed the terms and conditions of contracts directly

with a selection of distributor customers, including whether there are side agreements and terms not formally included in the contract that may impact the Company's revenue recognition. In addition, we obtained written representations from members of the commercial organization regarding the completeness of the terms and conditions reported to the legal and accounting departments

34.     Regarding the Company's internal controls, the Form 10-K disclosed:

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that are filed or submitted under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow for timely decisions regarding required disclosures. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, as ours are designed to do, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures were effective at a reasonable assurance level

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance of achieving their control objectives.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2023. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (2013 Framework). Based on its assessment, management concluded that, as of December 31, 2023, the Company's internal control over financial reporting was effective. Ernst & Young LLP, an independent registered public accounting firm, has issued an auditors' report on our internal control over financial reporting as of

December 31, 2023, which is included elsewhere in this Annual Report on Form 10-K.

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during the three months ended December 31, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

35.    Accordingly, as of December 31, 2023, Defendants Martin, Herde, Cunningham, Daverman, DeFord, Gray, Hopfield, Lucier, Marker, Mihas, and Prahalad were aware that the Company's  goodwill impairment assessment and revenue recognition were critical accounting matters that the independent auditor had found challenging to evaluate due to, among other things, the Company's record keeping, its sales practices, and the subjective judgments employed by management.

36.    On April 25, 2024, the Board, including Defendants Martin, Herde, Cunningham, Daverman, DeFord, Gray, Hopfield, Lucier, Marker, Mihas, and Prahalad, caused the Company to issue a definitive proxy statement soliciting stockholder votes in advance of the special meeting to be held May 23, 2024 (the "2024 Proxy"). These eleven Defendants solicited stockholder votes in favor of four management proposals, including the election of Daverman, Gray, and Mihas, and non-party Carl Hull ("Hull"), to new terms as directors through the 2027 annual meeting.  The 2024 Proxy stated that two of the four director nominees for election, Daverman and Mihas, were nominated by GTCR.  The 2024 Proxy incorporated the Company's 2023 10-K by reference.

37.    The 2024 Proxy stated that the Audit Committee of the Board, comprised of Defendants DeFord, Gray, and Hopfield, and non-party Anat Ashkenazi, was "responsible for, among other matters," "discussing on a periodic basis, or as appropriate, with management, our policies, programs and controls with respect to risk assessment and risk management," "reviewing and discussing with management and the independent registered public accounting firm our annual and quarterly

1  consolidated financial statements and related disclosures as well as critical accounting

2  policies and practices used by us," "reviewing the adequacy of our internal control

3  over financial reporting and disclosure controls and procedures," "stablishing policies

4  and procedures for the receipt and retention, follow-up and resolution of accounting,

5  internal accounting controls or auditing matters, complaints and concerns."

6      38.    The 2024 Proxy disclosed the following about the Board's role in risk

7  oversight:

> While our Nominating, Governance and Risk Committee has overall
> responsibility for risk oversight, primary oversight of certain risks has
> been delegated to other committees. Our Audit Committee monitors our
> major financial risk exposure. Our Compensation and Leadership
> Development Committee oversees the design and implementation of our
> compensation policies and programs and monitors the incentives created
> by these policies and programs. We are committed to ensuring the Board
> and its committees are consistently updated on threats to our business
> and receive consistent updates on risk mitigation processes.

> In connection with its reviews of the operations of our business, our full
> Board addresses the primary risks associated with our business, such as
> strategic planning. The Board appreciates the evolving nature of our
> business and industry and is actively involved with monitoring new
> threats and risks as they emerge.

> At periodic meetings of the Board and its committees, management
> reports to and seeks guidance from the Board and its committees with
> respect to the most significant risks that could affect our business, such
> as legal risks, information security and privacy risks, and financial, tax
> and audit related risks.

19      39.    The 2024 Proxy was materially misleading in that it: (i) touted Audit

20  Committee responsibilities but omitted to disclose that the Audit Committee was not

21  discharging its duties under the Audit Committee Charter, while soliciting

22  shareholder votes to reelect Defendant Gray, an Audit Committee member, to a new

23  three-year term as director; and (ii) touted the Board's oversight of enterprise risk but

24  omitted to disclose that the Board was not adequately overseeing risks related to the

25  Company's internal controls related to critical audit matters, while soliciting

26  shareholder votes to reelect Defendants Daverman, Gray, and Mihas to new three-

27  year terms as directors.

28

40.     On May 8, 2024, the Individual Defendants caused the Company to issue a press release announcing its financial results for the first quarter of 2024, which stated in relevant part:

**Financial Highlights:**

•Quarterly revenue of $64.2 million, Net loss of $(22.7) million, and Adjusted EBITDA of $7.8 million; and

•Reaffirmed financial guidance for the full year 2024 including a revenue range of $265.0 million to $285.0 million.

41.     The May 8, 2024 press release also described material weaknesses to the Company's internal controls as a risk that had not materialized:

Important factors that could cause Maravai's actual results and financial condition to differ materially from those indicated in the forward-looking statements include…

•     Risks related to Maravai's annual assessment of the effectiveness of Maravai's internal control over financial reporting, including the potential existence of any material weakness or significant deficiency.

42.     On May 9, 2024, the Individual Defendants caused the Company to submit its quarterly report for the period ended March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further stated the following regarding the Company's Evaluation of Disclosure Controls and Procedures, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed

and operated, can provide only reasonable assurance of achieving the desired control objective, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of March 31, 2024.***

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during the three months ended March 31, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting

43.    On May 28, 2024, the Company filed a Form 8-K with the SEC, disclosing the results from the votes on the proposals contained the 2024 Proxy. In particular, the four management nominees for director were elected to new terms. The misleading disclosures in the 2024 Proxy were fundamental to the shareholder approval of the 2024 Proxy's proposals. As a result of the misleading statements and omissions, the Company was harmed.

44.    On August 7, 2024, the Individual Defendants caused the Company to issue a press release announcing its financial results for the second quarter of 2024, which stated in relevant part:

**Financial Highlights:**

•***Quarterly revenue of $73.4 million, Net loss of $(14.5) million, and Adjusted EBITDA of $16.9 million;*** and

•Reaffirmed revenue guidance for the full year 2024 in the range of $265.0 million to $285.0 million.

\*                          \*                          \*

**Second Quarter 2024 Financial Results**

***Revenue for the second quarter was $73.4 million, representing a 6.5% increase over the same period in the prior year and was driven by the following***:

• Nucleic Acid Production revenue was $58.5 million for the second quarter, representing a 9.8% increase year-over-year. The revenue increase was primarily driven by higher demand for GMP CleanCap analogs, GMP mRNA, and our Glen Research product portfolio.

• Biologics Safety Testing revenue was $14.9 million for the second quarter, representing a 4.7% decrease year-over-year. The revenue decline was primarily due to lower demand trends in China.

Net loss and Adjusted EBITDA (non-GAAP) were $(14.5) million and $16.9 million, respectively, for the second quarter of 2024, compared to net loss and Adjusted EBITDA (non-GAAP) of $(11.9) million and $9.1 million, respectively, for the second quarter of 2023.

45.    On August 8, 2024, the Individual Defendants caused the Company to submit its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further stated the following regarding the Company's Evaluation of Disclosure Controls and Procedures, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of June 30, 2024.***

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during the three months ended June 30, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

46.     On November 7, 2024, the Individual Defendants caused Maravai to issue a press release announcing its financial results for the third quarter of 2024, which stated in relevant part:

**Financial Highlights:**

• ***Quarterly revenue of $65.2 million, Net loss of $(176.0) million (including a goodwill impairment of $154.2 million),*** and Adjusted EBITDA of $12.7 million; and

• Updated revenue guidance for the full year 2024 to be in the range of $255.0 million to $265.0 million.

\*                    \*                    \*

**Third Quarter 2024 Financial Results**

***Revenue for the third quarter was $65.2 million, representing a 2.5% decrease over the same period in the prior year and was driven by the following:***

• Nucleic Acid Production revenue was $49.9 million for the third quarter, representing a 2.5% decrease year-over-year. The revenue decrease was primarily driven by lower demand for research and discovery products.

• Biologics Safety Testing revenue was $15.3 million for the third quarter, representing a 2.5% decrease year-over-year, primarily due to lower demand in the bioprocessing market.

Net loss and Adjusted EBITDA (non-GAAP) were $(176.0) million and $12.7 million, respectively, for the third quarter of 2024, compared to net loss and Adjusted EBITDA (non-GAAP) of $(15.1) million and $11.9 million, respectively, for the third quarter of 2023.

47.     On November 12, 2024, the Individual Defendants caused the Company to submit its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "3Q24 10-Q"). It stated that the Company performed an impairment test and concluded that the "TriLink reporting unit had a carrying value that exceeded its estimated fair value," leading to a goodwill impairment of $154.2 million. The report stated, in relevant part:

***In connection with preparing its financial statements for the quarter ended September 30, 2024, the Company tested its reporting units for potential goodwill impairment in response to impairment indicators identified during the Company's forecasting process.*** During the

quarter ended September 30, 2024, the Company revised its long-term forecast to reflect lower projected near term revenues due to lower demand in research and discovery products within our Nucleic Acid Production business. This revision also considered the slower than expected transition to new mRNA clinical trials as customers prioritize existing programs and more conservatively invest in new programs as the results of continued macroeconomic pressures. The Company performed a quantitative goodwill impairment test on each of its four reporting units.

The Company performed the impairment test using a combination of the income and the market approach to determine whether the fair value of each reporting unit was less than its carrying value. The income approach utilizes a discounted cash flow model with inputs developed using both internal and market-based data, while the market approach utilizes comparable company information. The significant assumptions in the discounted cash flow models vary amongst, and are specific to, each reporting unit and include, but are not limited to, discount rates, revenue growth rate assumptions (including terminal growth rates) and operating margin percentages. Discount rates were determined using a weighted average cost of capital specific to each reporting unit and other market and industry data. For TriLink, the selected discount rate was 10.5%. These assumptions were developed in light of current market conditions and future expectations which include, but were not limited to, new product and service developments, impact of competition and future economic conditions. These estimates and assumptions represent a Level 3 measurement because they are supported by little or no market activity and reflect our own assumptions in measuring fair value. Based on its interim quantitative assessment, the Company concluded that the TriLink reporting unit had a carrying value that exceeded its estimated fair value. As a result, the Company recorded goodwill impairment of $154.2 million on the condensed consolidated statements of operations, which was the entire goodwill balance at the reporting unit. ***No impairment was recorded for the Company's remaining three reporting units, as each of their fair values exceeded their respective carrying values.***

48.    The 3Q24 10-Q further stated the following regarding the Company's Evaluation of Disclosure Controls and Procedures, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms,

and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of September 30, 2024.***

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during the three months ended September 30, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

49.    On January 8, 2024, the Individual Defendants caused Maravai to issue a press release announcing certain preliminary financial results for the year ended December 31, 2024. The press release reported that "based on preliminary year-end results and subject to year-end closing adjustments, the Company expects to report total 2024 revenue near the mid-point of the previously announced guidance range of $255.0 million and $265.0 million."

50.    The above statements were materially misleading because they failed to disclose that: (1) Maravai lacked adequate internal controls over financial reporting related to revenue recognition; (2) as a result, the Company inaccurately recognized revenue on certain transactions during fiscal 2024; (3) its goodwill was overstated; and (4) as a result of the above, Defendants' statements about Maravai's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**C.    The Truth Slowly Emerges**

51.    On February 25, 2025, before the market opened, Maravai issued a press release, postponing its fiscal 2024 earnings release and announcing it would delay filing its annual report on Form 10-K for the fiscal year ended December 31, 2024. Specifically, the press release stated, in relevant part:

Maravai LifeSciences Holdings, Inc. (Maravai) (NASDAQ: MRVI), a global provider of life science reagents and services to researchers and biotech innovators, today announced that it is postponing its previously announced earnings release and call scheduled for February 25, 2025. It also announced that it intends to file a Form 12b-25, Notification of Late Filing, with the U.S. Securities and Exchange Commission and will delay the filing its annual report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 Form 10-K"). Maravai intends to hold its postponed earnings call and to file the 2024 Form 10-K as soon as practicable and on or before March 18, 2025, prior to the expiration of the automatic extension of fifteen calendar days from the original 2024 Form 10-K due date of March 3, 2025.

Maravai requires additional time to complete its year-end financial close process for reasons related primarily to the following items. First, Maravai requires additional time to complete its assessment of a potential non-cash impairment charge related to goodwill associated with its previous acquisition of Alphazyme LLC. Second, Maravai requires additional time to assess an error identified during the close process with respect to revenue recognition associated with a single shipment identified in year-end audit procedures that resulted in approximately $3.9 million in revenue being recorded in the final week of the second quarter of 2024 upon shipment when it should have been recorded in the first week of the third quarter of 2024 upon receipt by the customer. This revenue recognition error is not expected to impact full-year 2024 revenue, which Maravai still expects to be near the mid-point of the previously announced guidance range of $255.0 million and $265.0 million. Third, Maravai requires additional time to complete its assessment of the effectiveness of its disclosure controls and procedures and internal controls over financial reporting as of December 31, 2024, and any remediation, including with respect to remediation of a material weakness in its internal controls over revenue recognition identified by management.

52.     On this news, the Company's share price fell $0.87 or 21.70%, to close at $3.14 per share on February 25, 2025, on unusually heavy trading volume.

53.     On March 18, 2025, Maravai filed its 2024 10-K, reporting $259.18 million in revenue. It also reported a $11.9 million goodwill impairment to reflect lower projected near-term revenues due to lower demand in enzyme products within the Alphazyme reporting unit. Specifically, it stated:

In connection with preparing our financial statements for the year ended December 31, 2024, we tested our reporting units for potential goodwill impairment in response to impairment indicators identified during our forecast process and the sustained decline in our stock price. As of December 31, 2024, we revised our long-term forecast to reflect lower projected near-term revenues due to lower demand in enzyme products within our Nucleic Acid Production business. As such, we performed a quantitative goodwill impairment test on each of our reporting units with goodwill as of December 31, 2024, and as a result, we concluded that the

Alphazyme reporting unit, which is contained in the Nucleic Acid Production segment, had a carrying value that exceeded its estimated fair value. As a result, we recorded goodwill impairment of $11.9 million on the consolidated statements of operations. No impairment was recorded for any of our other reporting units at that time.

54.     In the 2024 10-K, the Company also identified material weaknesses in revenue and accounts receivable, as well as in goodwill impairment. Specifically, it stated:

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2024. Based on the results of this evaluation, our management concluded that our internal control over financial reporting was ineffective as of December 31, 2024, because we identified the following material weaknesses:

•*Revenue and accounts receivable*: Management did not design and operate effective controls over the Company's revenue process. Specifically, we did not design and maintain effective controls over the timing of when the Company has transferred control of goods to its customers at period end, segregation of duties related to customer purchase order information entered into the Company's IT systems, accounting for customer product revenue, and the authorization and documentation of pricing approvals. The material weakness is an aggregation of these matters.

•*Goodwill impairment*: Management did not operate effective controls over the key inputs and assumptions that were utilized to determine the fair value of reporting units in the Company's quantitative goodwill impairment assessment as of December 31, 2024.

## VI.   DAMAGES TO THE COMPANY

55.     As a direct and proximate result of the Individual Defendants' conduct, Maravai has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

   a) Any funds paid to settle the Securities Class Action;

   b) Loss of market capital; and

   c) Costs incurred from compensation and benefits paid to the Defendants who have breached their duties to Maravai.

56.     In addition, Maravai's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.   The Company still has not fully admitted the nature of its false statements and the true

condition of its business.   The credibility and motives of management are now in serious doubt.

57.     The actions complained of herein have irreparably damaged Maravai's corporate image and goodwill.  For at least the foreseeable future, Maravai will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Maravai's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

58.     Plaintiff brings this action derivatively in the right and for the benefit of Maravai to redress injuries suffered, and to be suffered, by Maravai as a direct result of the wrongdoing alleged herein.  Maravai is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

59.     Plaintiff will adequately and fairly represent the interests of Maravai in enforcing and prosecuting its rights.

60.     Plaintiff has continuously been a shareholder of Maravai at times relevant to the wrongdoing complained of and is a current Maravai shareholder.

61.     When this action was filed, Maravai's Board of Directors consisted of eleven directors, Defendants Eckert, Cunningham, Daverman, DeFord, Gray, Hopfield, Lucier, Marker, Mihas, and Prahalad, and non-party director Bernd Brust ("Brust"). Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

62.     Brust is the Company's CEO and does not meet the Nasdaq requirements for director independence.  Although Brust only recently became CEO and his total pay for 2025 has not been disclosed, it is undoubtedly material to him.  According to the Company's public filings, Brust earns a base salary of $750,000 and receives lucrative equity compensation.  Brust could disinterestedly evaluate a demand that

might cause him to sue his fellow directors, including the members of the Company's Nominating, Governance and Risk Committee, who are Cunningham, Hopfield, and Prahalad.  Additionally, Brust could not disinterestedly consider a demand to sue his CFO, defendant Herde, with whom he works on a day-to-day basis and with whom a collaborative working relationship is fundamental for Brust to have success as a CEO. As a result, demand is futile as to Brust.

63.    According to the 2024 Proxy, Maravai's directors determined that the following five directors were not independent under Nasdaq listing rules: Cunningham, Daverman, Marker, and Mihas.  Cunningham, Daverman, and Mihas are members of the GTCR board of managers.  As the Company has repeatedly disclosed in its public filings: "investment entities affiliated with [GTCR] currently control a majority of the voting power of our outstanding common stock and may have interests that conflict with ours or yours in the future."  As a result, Defendants Cunningham, Daverman, Marker, and Mihas could not disinterestedly consider a demand for action in connection with the wrongdoing alleged herein because their significant financial interests in Maravai stock and the related party transactions in which GTCR engages with Maravai cause GTCR's interests to conflict with those of the minority shareholders.

64.    DeFord, Gray, and Hopfield served as members of the Audit Committee at relevant times. As such they are responsible for the integrity of Maravai's financial statements. In their capacities as Audit Committee members, DeFord, Gray, and Hopfield reviewed and approved the materially misleading statements and allowed them to be disseminated in Maravai's SEC filings and other disclosures. Thus, DeFord, Gray, and Hopfield breached their fiduciary duties and are not disinterested, and demand is excused as to them.

65.    Demand is excused as to Martin, Cunningham, Daverman, DeFord, Gray, Hopfield, Lucier, Marker, Mihas, and Prahalad because they face a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act as set forth

herein. As a result, they could not disinterestedly consider a demand for action that would cause them to assess their own state of mind and the knowledge they possessed at issue with the wrongdoing alleged herein.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

66.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.    The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Maravai's business and affairs, particularly with respect to issues as fundamental as public disclosures.

68.    The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Maravai.

69.    In breach of their fiduciary duties owed to Maravai, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

70.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall prospects.

71.    As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Maravai has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

**Against Defendants Martin, Cunningham, Daverman, DeFord, Gray, Hopfield, Lucier, Marker, Mihas, and Prahalad for Violations of Section 14(a) of the Exchange Act**

72.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on April 25, 2024 violated §14(a) and Rule 14a-9 because it solicited stockholder approval to elect Daverman, Gray, and Mihas, and non-party Hull to new three year terms as directors.

74.    Defendants knew or recklessly failed to know that the statements and omissions regarding the qualifications and oversight capabilities of the Board's director nominees, as well as their activities as Board and committee members, contained in the 2024 Proxy were materially false and misleading.

75.    The misrepresentations and omissions in the 2024 Proxy were material to Company shareholders in voting on the 2024 Proxy. At the time of the proxy solicitation, the Company's largest stockholder and controlling entity, GTCR, held approximately 55.92% of the Company's outstanding voting power. The proxy solicited votes for four director nominees, only two of whom had been nominated by GTCR. Under the Company's governing documents, directors are elected by a plurality of the votes cast, meaning that any nominee receiving at least one affirmative vote is elected in an uncontested election.

76.    Because GTCR did not nominate two of the four directors, it retained the power and discretion to withhold its votes from those individuals. If it had done so, and if no other shareholder cast votes in favor of a given nominee, that nominee would

not have been elected. As a result, the 2024 Proxy was an essential link in securing the election of directors who lacked the support of GTCR. Had the 2024 Proxy accurately disclosed the material facts, including the Audit Committee and full Board's failure to discharge its risk and oversight responsibilities, reasonable shareholders would have withheld their votes, and one or more nominees would not have been elected. Accordingly, the false and misleading proxy statement deprived shareholders of the opportunity to make an informed voting decision and resulted in harm to the Company, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

77.    The 2024 Proxy was thus an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

78.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

79.    Plaintiff on behalf of the Company has no adequate remedy at law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Maravai, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Maravai and that Plaintiff is an adequate representative of the Company;

B.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Maravai;

D.    Directing Maravai to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Maravai and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation

and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

    1.    a proposal to strengthen the Company's controls over financial reporting;

    2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

    3.    a proposal to strengthen Maravai's oversight of its disclosure procedures;

    4.    a provision to control insider transactions; and

    5.    a provision to permit the stockholders of Maravai to nominate at least three candidates for election to the Board;

E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Maravai has an effective remedy;

F.    Awarding to Maravai restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

1   DATED:  June 20, 2025              GLANCY PRONGAY & MURRAY LLP

2

3

4                                      By:  _/s/ Pavithra Rajesh_____

5                                      Robert V. Prongay
                                       Pavithra Rajesh
6                                      1925 Century Park East, Suite 2100
                                       Los Angeles, California 90067
7                                      Telephone:  (310) 201-9150
                                       Facsimile:  (310) 201-9160
8                                      rprongay@glancylaw.com
                                       prajesh@glancylaw.com
9

10                                     Benjamin I. Sachs-Michaels
                                       745 Fifth Avenue, Fifth Floor
11                                     New York, New York 10151
                                       Telephone: (212) 935-7400
12                                     bsachsmichaels@glancylaw.com

13

14                                     *Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Docusign Envelope ID: 5BC13CC1-066E-4298-08E9-4087D5E81F7D

## <u>VERIFICATION</u>

I, John Mercer, do hereby verify that I am a holder of stock of Maravai LifeSciences Holdings, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Date: 6/18/2025                           _John Mercer_____

                                          John Mercer